**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LEONA BELDINI, | Civil Action No.: 12-2017 (JLL) |
| Petitioner, | |
| v. | **OPINION** |
| UNITED STATES PROBATION OFFICE, | |
| Respondent. | |

This matter comes before this Court by way of Petitioner Leona Beldini ("Petitioner")'s

Petition for a Writ of Error Coram Nobis pursuant to 28 U.S.C. § 1651(a), or, in the alternative, a

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254[1] [Docket Entry No. 1 (Civ. No. 12-2017)].

The Court notes that, although Petitioner originally sent a letter request that this Court grant a

stay of Petitioner's civil matter based upon her medical condition, Petitioner subsequently filed a

second letter in essence retracting the request for a stay and asking that the matter be heard

forthwith to enable Petitioner the opportunity to seek emergent relief from the Court of Appeals,

if necessary. [Docket Entry Nos. 138, 142 (Crim. No. 09-637)]. To accommodate Petitioner's

request, the Court scheduled oral argument on this matter for April 9, 2012. Thereafter at

---

[1] Petitioner mistakenly filed her Habeas Corpus Petition requesting relief pursuant to 28 U.S.C. § 2254, which is a remedy available to persons in custody pursuant to the judgment of a State court. See 28 U.S.C. § 2254. Since Petitioner is in custody pursuant to the judgment of this Court, any applicable remedy for Petitioner's claims of being in federal custody in violation of the Constitution, laws or treaties of the United States rests in 28 U.S.C. § 2255. As Petitioner's Counsel has confirmed on the record of this Court's April 10, 2012 hearing that Petitioner in fact seeks habeas relief under § 2255, the Court will henceforth construe Petitioner's motion to vacate, set aside or correct her sentence as invoking § 2255. Further, Petitioner mistakenly filed her Petition under Criminal Number 09-637 (JLL), but since both claims for relief put forward in said Petition must be advanced in a separately filed civil action, the Court directed the Clerk's Office to docket the Petition and subsequent submissions by the Parties pertaining to the Petition under Civil Number 12-2017. Due to the overlapping documents relevant to the Petition on both Petitioner's criminal case and civil case, the Court will cite to documents on the relevant dockets with the docket number followed by the appropriate case number.

Petitioner's request, oral argument was adjourned and the matter was heard on April 10, 2012.[2] The Court has considered the submissions and oral arguments of the Petitioner and of the Respondent in support of and in opposition to the instant Petition. For the reasons stated herein, Petitioner's application for a Writ of Coram Nobis is DENIED, and Petitioner's application for a Writ of Habeas Corpus is also DENIED. Petitioner's request to stay this matter due to Petitioner's serious medical condition is also DENIED as moot due to Petitioner's subsequent request to this Court for an emergency hearing and decision.

## I. BACKGROUND

### A.   Indictment, Conviction, and Sentence

In 2009, Petitioner Leona Beldini was a Deputy Mayor of Jersey City, New Jersey, reporting directly to Mayor Jerramiah Healy and serving as Healy's liaison to and representative on certain Jersey City agencies and boards.[3] Petitioner also owned a real estate business during her period of service as the treasurer of Healy's re-election campaign, known as "Healy for Mayor '09," for which she organized fundraising events sponsored by the Jersey City Democratic Committee ("JCDC"). Solomon Dwek ("Dwek") is a cooperating witness with the Federal Bureau of Investigation ("FBI") in its large-scale investigation into government corruption. Using the name "David Esenbach," Mr. Dwek posed as a real estate developer with the ultimate objective of bribing Mayor Healy to expedite his fictitious real estate development – the Garfield Development ("the Development"). Dwek, posing as said developer, asked Edward Cheatam ("Cheatam"), a Hudson County public official, and Jack Shaw ("Shaw"), a political consultant now deceased, to facilitate meetings between himself and Healy, so that he could

---

[2] Petitioner did not appear at the hearing held on April 10, 2012 on the instant motion, waiving her right to appear due to health issues in a signed statement admitted into the record during said hearing as Exhibit 1.

[3] This section adopts the facts as adduced in the "Background" section of the Third Circuit Opinion affirming this Court's rulings regarding its jury instructions, the evidence produced at trial, and alleged prosecutorial misconduct. See United States v. Beldini, 443 Fed. Appx. 709, 710-12 (3d Cir. 2011).

bribe Healy to expedite approvals on his Development. Evidence was produced at trial that Petitioner facilitated meetings between Healy, Dwek, Shaw and Cheatam, received money from Dwek, and then broke up that money into smaller increments to conceal the identity of the real contributor. Specifically, Petitioner was purported to have received checks from Dwek through Shaw and Cheatam to expedite his real estate development, converted larger checks into smaller amounts, and deposited them into the campaign account for "Healy for Mayor '09."

On July 23, 2009, Petitioner was arrested and charged with conspiring to obstruct, delay, and affect interstate commerce by extortion under color of official right in violation of 18 U.S.C. § 1951(a). [Docket Entry No. 1 (Crim. No. 09-637)]. Petitioner was indicted on August 20, 2009 by a grand jury in Newark, and on November 19, 2009, Petitioner was charged in a six-count Superseding Indictment with violating the Hobbs Act, 18 U.S.C. § 1951(a) (Counts 1, 2 and 3), and with federal program bribery in violation of 18 U.S.C. § 666(a)(1) (Counts 4, 5, and 6). [Docket Entry Nos. 13, 40 (Crim No. 09-637)]. On January 25, 2010, the case proceeded to trial. On February 11, 2010, the jury convicted Petitioner of Counts 4 and 5 for federal program bribery based on two $10,000 bribes Petitioner accepted on March 26, 2009 and May 5, 2009, but acquitted her of Counts 1, 2, 3 and 6 for extortion under the Hobbs Act and for corruptly agreeing to accept the thousands of dollars in real estate commissions that she would have earned on the Development as its real estate broker. [Docket Entry No. 71 (Crim. No. 09-637)].

Petitioner filed a motion for a judgment of acquittal or for a new trial before this Court on February 17, 2010, arguing: (1) that Counts 4 and 5 could not be proved because campaign contributions did not constitute "anything of value" under 18 U.S.C. § 666(a)(1)(B); (2) that the evidence failed to prove that she was an "agent" within the meaning of § 666(d)(1); (3) that the prosecutor improperly misused consciousness of guilt evidence during rebuttal summation; and

(4) that the jury instructions for Counts 4 and 5 erroneously omitted the explicit quid pro quo requirement contained in the instructs for the Hobbs Act Counts 1 through 3. [Docket Entry No. 72 (Crim. No. 09-637)]. This Court denied that motion on June 2, 2010, finding that: (1) as a matter of law, the term "anything of value" encompassed campaign contributions; (2) evidence established that Petitioner was an "agent"; (3) Petitioner had forfeited her objection to the jury instructions on Counts 4 and 5, and there was no indication in the Court transcripts or notes that the defendant objected to the fact that the quid pro quo was not being charged, that the statute does not require that the quid pro quo to be charged, and that evidence of a quid pro quo did not seem necessary for those violations; (4) § 666(a)(1)(B)'s corrupt intent requirement obviated the need for an explicit quid pro quo in cases involving campaign contributions; and (5) there was no prosecutorial misconduct in the rebuttal summation. [Docket Entry No. 94 (Crim. No. 09-637)]. On June 14, 2010, this Court sentenced Petitioner to two concurrent terms of 36 months of imprisonment, and entered final judgment. [Docket Entry No. 100 (Crim. No. 09-637)].

**B.     Petitioner's Third Circuit Appeal**

Petitioner timely appealed this Court's final judgment on June 21, 2010. [Docket Entry No. 101 (Crim. No. 09-637)]. Petitioner's appeal was limited to three questions: (1) whether this Court erred in allegedly failing to instruct the jury that a quid pro quo was required by 18 U.S.C. § 666(a)(1)(B); (2) whether there was sufficient evidence that Beldini was an "agent" of a local government within the meaning of 18 U.S.C. § 666(a)(1)(B) and that campaign contributions were included as "anything of value" within the meaning of 18 U.S.C. § 666(a)(1)(B); and (3) whether this Court erred by not declaring a mistrial due to alleged prosecutorial misconduct in the rebuttal summation. U.S. v. Beldini, 443 Fed. Appx. 709, 710 (3d Cir. 2011). Petitioner did not appeal any of the evidentiary rulings of this Court with respect to Solomon Dwek's

4

testimony during her trial. The Third Circuit affirmed all of this Court's rulings, finding that, because Beldini did not object to the § 666 jury instructions or put this Court on notice of the issue prior to the jury retiring to deliberate, appellate review of the § 666 jury instructions was precluded, and no plain error could override the preclusion. Id., 715-16. Further, the Third Circuit found that, on the trial record, evidence could reasonably support a finding that Beldini was an "agent" for the purposes of § 666 and that campaign contributions were "something of value" for the purposes of the same. Id., at 719-20. Finally, the Third Circuit found that this Court did not err by declining to declare a mistrial due to prosecutorial misconduct, stating that "there is a considerable amount of evidence showing that Beldini violated § 666, including video and audio recordings." Id., at 720-21.

Following the issuance of the Third Circuit's non-precedential opinion, the Government moved to revoke Petitioner's bail and designated a surrender date. [Docket Entry No. 119 (Crim. No. 09-637)]. On January 5, 2012, this Court granted the Government's motion following considerable briefing by the Parties, submissions from medical experts on behalf of Petitioner and the United States Bureau of Prisons, and after oral argument. [Docket Entry No. 135 (Crim. No. 09-637)]. Petitioner was accordingly ordered to voluntarily surrender on April 3, 2012. (Id.). Petitioner filed the instant Petition on March 9, 2012. [Docket Entry No. 136 (Crim. No. 09-637); Docket Entry No. 1 (Civ. No. 12-2017)].[4]

## C.   Petitioner's Section 2255 Claims

Beldini's Petition requests this Court's relief for error she allegedly suffered as a result of this Court's failure to restrict Solomon Dwek's testimony when, "[t]hroughout the trial, during

---

[4] While Petitioner's letter brief is dated October 24, 2011 in the letterhead, the Petition notice is dated March 8, 2012 and the certification of filing and proof of service is dated March 9, 2012. The Court treats the Petition as filed on March 9, 2012, the date upon which it was electronically filed on the CM/ECF Docket. Petitioner's Counsel confirmed on the record of this Court's April 10, 2012 hearing on the instant Petition that the October 24, 2011 dating was made in error.

both direct and cross-examination, Dwek inappropriately expressed his belief that Beldini was guilty and offered his own opinions, interpretations, and conclusions about the case." (Pet., at 3). The Petition asserts that, "[h]ad the Court imposed in [Petitioner's] case the same testimonial restrictions carved out in Suarez and Elwell, [Petitioner] might have been acquitted of all charges and avoided the three year prison term she is scheduled to begin in April." (Id.). Petitioner requests two alternative avenues of relief for this error: (1) a Writ of Coram Nobis pursuant to 28 U.S.C. § 1651(a), through which Petitioner contends a new trial should be ordered; or (2) a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255, through which Petitioner is construed to be moving for the Court to vacate, set aside or correct her sentence.

## II. LEGAL STANDARD

28 U.S.C. § 1651(a) provides that:

[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The writ of error coram nobis is available as a remedy in order to vacate a federal conviction where the sentence imposed following such conviction has been served. The writ is an extraordinary remedy used to attack allegedly invalid convictions that have continuing consequences, when the petitioner has served his sentence and is no longer "in custody" for purposes of 28 U.S.C. § 2255. United States v. Stoneman, 870 F.2d 102, 105-6 (3d Cir. 1989); see also United States v. Rhines, 640 F.3d 69, 71 (3d Cir. 2011)(affirming the requirement that a petitioner must no longer be in custody for the purposes of a § 2255 petition in order to seek relief under the writ of coram nobis). To so attack an allegedly invalid conviction, the petitioner must show that he or she is suffering from continuing consequences of said conviction. Id. (citing United States v. Morgan, 346 U.S. 502, 512-13 (1954)).

As an extraordinary remedy, it has been deemed appropriate to correct errors for which

there was no remedy available at the time of trial and where "sound reasons" exist for failing to seek relief earlier. Morgan, 346 U.S. at 512. "Only where there are errors of fact of 'the most fundamental kind, that is, such as to render the proceeding itself irregular and invalid,' [sic] can redress be had." United States v. Cariola, 323 F.2d 180, 184 (3d Cir. 1963)(quoting United States v. Mayer, 235 U.S. 55, 69 (1914)). The relevant error must go to the jurisdiction of the trial court, thus rendering the trial itself invalid; an error that could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ. Stoneman, 870 F.2d at 106. Earlier proceedings are presumptively correct, and the Petitioner bears the burden to show otherwise. Id. (quoting Cariola, 323 F.2d at 184). "The interest in finality of judgments dictates that the standard for a successful collateral attack on a conviction be more stringent than the standard applicable on a direct appeal." United States v. Gross, 614, F.2d 365, 368 (3d Cir. 1980). It is even more stringent than that on a petitioner seeking habeas corpus relief under § 2255. See United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)(unlike in a habeas petition, coram nobis provides no opportunity to retry defendant using newly discovered evidence where the sentence was already served). When an alternative remedy is available, a writ of error coram nobis may not issue. See United States v. Denedo, 129 S.Ct. 2213, 2220 (2009).

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, that a federal prisoner may challenge the legality of a federal sentence on four grounds:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  In considering a § 2255 motion, the Court "must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  Moreover, the Court "must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." Government of Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  Inasmuch as the Parties present no facts in dispute, and Petitioner bases her request under the Writs of Coram Nobis and Habeas Corpus on questions of law, the Court ordered and heard oral argument on the legal claims asserted without ordering an evidentiary hearing.

### III.  DISCUSSION

#### A.    Writ of Coram Nobis

Since Petitioner bases her two requests for relief on the same purported error, the Court will fully recite the facts relevant to both requests in this subsection.  The exclusive grounds for Petitioner's collateral attack on this Court's conviction and sentence is in certain statements made during the direct and cross-examination testimony of Solomon Dwek during her trial, testimony that she alleges violated her Sixth Amendment constitutional right to a fair trial.

Petitioner first asserts that she was prejudiced by being the first defendant to stand trial in the Operation Bid Rig prosecution, the largest corruption sting in New Jersey in which forty-six individuals were charged. (Pet., at 2).  Central to the Government's prosecution was its informant, Solomon Dwek, who served as a witness not only in Petitioner's trial, but also in the trial of Anthony Suarez, the former Mayor of Ridgefield, New Jersey.  (Id.).  The Government intended to use Mr. Dwek as a witness in the trial of Dennis Elwell, the former Mayor of Secaucus, New Jersey, including proposed evidence in its motion in limine filed before this

Court preceding Mr. Elwell's trial, but the Government ultimately decided not to us Mr. Dwek as a witness. (Id.). Petitioner claims that, during Mr. Dwek's testimony, he made a series of prejudicial statements that should not have been deemed admissible and that fundamentally impaired her right to a fair trial. (Id.). Petitioner further argues that, in subsequent trials for which Mr. Dwek was a witness, this Court acknowledged that Mr. Dwek should have been better "policed" in the Beldini trial, and that his testimony in the Suarez trial which used the term "bribe" should not be allowed as a legal conclusion. (Id., at 6-7).

The Petition offers the following list of examples in which Mr. Dwek made statements that were "inflammatory, opinionated, and otherwise inappropriate" (Id., at 2):

- Mr. Dwek repeatedly stated that he only met with "corrupt" politicians and officials, giving an improper opinion as to who was corrupt and who had accepted bribes (Id., at 3):

    - Testifying on direct examination, Mr. Dwek said that when he asked about Beldini, "Jack told you, you know, what I am trying to do?" that he meant that he "was trying to pay Leona Beldini cash corrupt payments for her assistance in expediting my approvals at the Garfield Avenue project." (Trial Tr. of Jan. 29, 2010, p. 5.43, 1.20-24).
    - Mr. Dwek and defense counsel had the following exchange: "Q. By the words you were suggesting that you got the mayor, and you got the deputy mayor. Isn't that right? A. Yes. After I already paid the bribes, I had them, yes. Q. You had to throw that in there, after you paid the bribes, is that correct? That was your little addition to the question, isn't that right? A. I was answering your question, what does it mean I had them, and I had them because I bribed them. Q. This is your pronouncement, not her affirmation, right? A. That is what I meant, correct." (Trial Tr. of Feb. 3, 2010, p. 6.131, 1.10-21).

- Mr. Dwek used the term "corrupt" and "corruption" 48 times while testifying, and used the phrase "official action" as though he knew what it meant and could comment on it (Id., at 3).

- Mr. Dwek used the term "bribe" or "bribery" on 37 occasions despite not having the right to draw legal conclusions about who accepted a bribe or what bribery meant as a matter of law (Id., at 4):

    - Mr. Dwek stated on direct examination that he understood a statement by Mr. Shaw to "use either, ah, Leona Beldini, who's the treasurer, or Craig Guy" "to, ah, deal with the cash" as meaning that "either Leona Beldini or Craig Guy would be the bag

person, the person that would handle the cash bribe on behalf of the mayor." (Trial Tr. of Jan. 29, 2010, p. 5.18, 1:1-3).

- Mr. Dwek testified on direct examination that he understood a statement he made to Mr. Shaw asking if Beldini "operates the way we like to operate" as meaning that he "wanted to confirm that Leona operated the way I did, and we did with accepting cash corrupt bribe payments for official action to expedite my approvals." (Trial Tr. of Jan. 29, 2010, p. 5.22, 1:6-9).

- Mr. Dwek testified on cross-examination that an FBI Agent gave him money for bribe payments in response to defense counsel's question about the name of the person who provided him with most of the money: "Q. He was the one, for example, who would give you most of the money that you would pass along to other people, isn't that right? A. For the bribe payments, yes." (Trial Tr. of Feb. 1, 2010, p. 6.108, 1:22-25.

- Mr. Dwek testified on cross-examination that, when asked whether Beldini was courteous to simply talk to him, he answered: "A. And accept the money, yes. Q. Did I say anything about accepting money? Did you just put that in there? A. I am putting that in there because you are trying to tell me she is courteous. She was courteous for her own good, not for my good." (Trial Tr. of Feb. 2, 2010, p. 7.188, 1:16-23).

- Mr. Dwek testified on cross-examination that he gave a bribe payment in the form of a check, despite the fact that the question posed was: "Q. So you are discussing a check, is that right? A. The form of a bribe payment in a check, yes." (Trial Tr. of Feb. 2, 2010, p. 7.161, 1:25 – p. 7.162, 1:1).

- Mr. Dwek opined on Beldini's guilt and controlling law in the case:

  - Mr. Dwek testified on cross-examination concerning legal conclusions: "Q. So if [Beldini] had a corrupt purpose, that would never be a question that would cross her mind, isn't that right? A. If she had a corrupt purpose, she would have walked out like many other politicians did and said, I'm not taking $20,000 through a bagman, and I'm not going to take any listing that's going to hurt me, between 20 and $40 million to expedite your approvals. Q. Was that question asked? A. You asked me if she had an intention, if she was corrupt, or if she was or wasn't corrupt, what she would do. I answered there were over a dozen other politicians that people vouched for that said they would take money to expedite your approvals, and they ended up, and they said, Dwek – well, they said, Esenbach, go to hell. We're not taking your money. We're not going to expedite your approvals." (Trial Tr. of Feb. 2, 2010, p. 7.114, 1:4-19).

Based on these statements made during trial, Petitioner argues that "Dwek twisted around questions asked, gave unresponsive answers, and volunteered personal opinions as he desired. He testified without regard for the jurors' function as exclusive fact-finders or the judge's role to explain the law." (Pet., at 5). Petitioner claims that Mr. Dwek's testimony was conclusory in

utilizing the terms "bribery" and "corrupt payments," and that such testimony contributed to her

conviction for bribery.  (Id.).

Petitioner further points to the Court's recognition in the trials of Mr. Suarez and Mr.

Elwell that such testimony by Mr. Dwek was not admissible.  For example, during this Court's

September 29, 2010 hearing in the Suarez case on the parties' respective motions in limine, the

Court responded to Mr. Suarez's defense counsel's concerns about Mr. Dwek's testimony by

stating as follows:

> Court: I know that your concern is Mr. Dwek being the savvy witness that he is, that he may say or sneak something out that concerns [guilt or innocence].  So what I intended to do with regard to this motion . . . is to make a ruling that no witness should be allowed to opine on the question of guilt or innocence of these defendants here and/or speak about the controlling law. . . .
>
> [Defense Counsel]: . . . [T]his was a motion that was more as a prophylactic measure, so that MR. Dwek is aware, as your Honor said, there is a line between his interpretation to crossing it over to say what Mr. Suarez understood it to mean.  You know, Mr. Dwek, depending on the question, can testify as to Mr. Dwek's understanding, but he seemed to go over the line to saying –
>
> [The Court]: I agree –
>
> [Defense Counsel]: -- and the defendant knew.
>
> [The Court]: -- he might have done that.  If I could police it in the last case, it wouldn't happen.  It was obviously my first experience with Mr. Dwek, but having said that, I think that this is something that I can handle."

(Suarez Motion Hearing Tr. of Sept. 29, 2010, p. 14:15 – 16:10 [Docket Entry No. 94 (Crim. No.

09-932)]).  During Mr. Suarez's trial, the prosecutor asked Mr. Dwek what he meant during a

conversation with Mr. Suarez when he said to him "[c]all it what you want," and specifically

whether or not he was trying to assure Mr. Suarez regarding payments, and Mr. Dwek replied

that, "What I was saying was, Mayor Suarez could call the money that I was paying whatever he

wanted, but I knew what I wanted and why I was paying. . . . if you didn't want to call it a bribe,

or call it nonofficial action, or the money I was giving --." (Suarez Trial Tr. on Oct. 6, 2010, p. 4.70, 1:11-14). At that point, Mr. Suarez's Defense Counsel objected, and the Court stated that, "You don't know what an official action is. This is a legal term. You are not here to give legal definitions. That is something I will give to the jury." (Suarez Trial Tr. on Oct. 6, 2010, p. 4.70, 1:14-19). A jury subsequently acquitted Mr. Suarez of the charges brought against him.

Mr. Suarez's co-defendant, Mr. Elwell, joined in Mr. Suarez's motions prior to their trials, and the Court stated to the prosecuting attorney in Mr. Elwell's criminal case that, with respect to the admissibility of Mr. Dwek's testimony, "he is not going to use the word 'bribe.' I think that it is a legal conclusion. I think that although it has happened in other cases, and it is not the end of the world, if the witness were to use the word 'bribe,' but I think when I weigh the necessity of the Government to have him say it, because of the cumulative evidence that you have on the issue from other witnesses, et cetera, when I weigh the prejudicial effect of the word and the common lay term understanding and the number of times that Mr. Dwek likes to use it, as has been the case in other cases, I think the fair thing to do, and it doesn't . . . tie the Government's hands in any way on this issue, is to just not let Mr. Dwek say that." (Elwell Motion Hearing Tr. of June 9, 2011, p. 15:15 – 16:3 [Docket Entry No. 91 (Crim. No. 09-864)]). The Government decided not use Mr. Dwek as a government witness against Mr. Elwell.

On the basis of the statements made by Mr. Dwek while testifying at Petitioner's trial as well as this Court's subsequent statements regarding the admissibility of conclusory or cumulative testimony prejudicial to defendants Suarez and Elwell, Petitioner requests that a new trial is warranted to correct the violations she suffered to her Sixth Amendment right to a fair trial. Petitioner asserts that, while the writ of error coram nobis is an unusual remedy, "it is nevertheless appropriate where necessary 'to achieve justice.'" (Pet., at 8).

The Government argues that the writ of coram nobis is not an available form of relief to Petitioner since: (1) she has not completed serving her sentence, but rather has not even begun to serve it; (2) she has available to her an alternative means of collaterally attacking her conviction, namely, her § 2255 habeas corpus petition; and (3) she has offered nothing to bring her claim of trial error within the sphere of the infrequent and extraordinary conditions under which the writ is granted. (Gov't Opp'n Br., at 10-11).

The Court agrees with the Government that Petitioner is not entitled to coram nobis relief. First, Petitioner is still "in custody," and coram nobis is reserved for situations where the petitioner is no longer "in custody" or serving her sentence. See United States v. Baptists, 223 F.3d 188, 189 (3d Cir. 2000)(per curiam). Second, Petitioner has not asserted a fundamental error that rendered her trial invalid on a jurisdictional basis. She claims that she was denied a fair trial based on Mr. Dwek's testimony, but makes no arguments regarding any fundamental jurisdictional defect over her criminal matter as adjudicated before this Court. Beldini offers only speculation that the charges against her and Mr. Dwek's testimony at trial would have resulted in a "not guilty" verdict on Counts 4 and 5. Finally, Petitioner has already an alternative route to collaterally attacking her conviction and sentence, and attempts to do so in the alternative through her petition for habeas corpus relief brought pursuant to 28 U.S.C. § 2255. The writ cannot issue if there are alternative remedies available. For these reasons, Petitioner's request for the Writ of Coram Nobis is denied.

## B.     Writ of Habeas Corpus (Section 2255)

The Parties concede that Petitioner is "in custody" for the purposes of 28 U.S.C. § 2255. (Pet., at 10; Gov't Opp'n Br., at 11). In establishing the grounds for her Petition, Petitioner points to the same statements cited infra by Mr. Dwek during her trial as well as the Court's

statements in the Suarez and Elwell matters concerning the admissibility of conclusory statements by Mr. Dwek. (Pet., at 11). Specifically, Petitioner states that her conviction should be reversed since Mr. Dwek's testimony, taken in the context of the trial as a whole, was sufficiently prejudicial to have deprived her of the right to a fair trial in violation of the Sixth Amendment since: (1) Mr. Dwek's remarks were persistent and created a likelihood that the jury would be misled; (2) the other evidence in the case was not strong enough to make Dwek's statements meaningless; and (3) the Court did not give any curative instructions about Dwek's remarks during the trial. (Pet., at 11-13). Petitioner does not raise an ineffective assistance of counsel claim in violation of her Sixth Amendment rights.

The Government makes two arguments in response. First, it argues that, although Petitioner may invoke 28 U.S.C. § 2255, her latest claim is procedurally defaulted since she did not object at trial to the terminology employed by Mr. Dwek during his testimony, and her Third Circuit appeal raised no claim relating to this Court's evidentiary rulings as to Mr. Dwek's testimony. (Gov't Opp'n Br., at 11). Second, and in the alternative, the Government states that, if the Court should find that Petitioner is not procedurally defaulted, her Petition must fail as she received a fair trial when the statements are reviewed in their full context, and, further, Mr. Dwek's testimony was permissible lay testimony under Federal Rule of Evidence 701. (Id., at 12-15).

### 1. Procedural Default

Collateral review of a conviction or sentence pursuant to 28 U.S.C. § 2255 "is not a substitute for direct review, [so] a movant ordinarily may only raise claims in a 2255 motion that [s]he raised on direct review. Put differently, a movant has procedurally defaulted all claims that [s]he neglected to raise on direct appeal." Hodge v. United States, 554 F.3d 372, 378-79 (3d Cir.

2009)(citing Bousley v. United States, 523 U.S. 614, 621 (1998)).  However, there are two exceptions to the general rule on procedural default: "[C]ourts will exempt a movant from that rule if [s]he can prove either that [s]he is actually innocent of the crime for which [s]he was convicted, or that there is a valid cause for the default, as well as prejudice resulting from the default."  Id., at 379 (citing Bousley, 523 U.S. at 622).  To show "actual innocence" under the first exception, a petitioner must demonstrate that, "in light of all of the evidence, it is more likely than not that no reasonable juror would have convicted h[er]."  Schlup v. Delo, 513 U.S. 298, 327-28 (1995)(quotations and citation omitted).  Valid cause under the second exception must be measured against a stringent standard of diligence, and "ordinarily requires a showing of some external impediment preventing counsel from constructing or raising a claim."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  Thus, the existence of cause for the purposes of procedural default depends on the petitioner's ability to show that an objective factor external to the defense impeded compliance with procedural rules.  Id.  Further, in order to show actual prejudice after proving cause, the petitioner must show a reasonable probability that the trial's result would have been different if the claimed errors in procedural default had not occurred.  Strickler v. Greene, 527 U.S. 263, 283 (1999).

Petitioner has not presented, and the Court's review of the record cannot find, any instance during the trial where the above-cited statements by Mr. Dwek were made and any objection was raised by her Defense Counsel.  Further, the claims that were raised on Petitioner's Third Circuit Appeal did not include a claim based in this Court's evidentiary rulings at trial or on appeal.  Rather, Petitioner's appeal was limited to the questions, as stated infra, of: (1) whether this Court failed to charge the jury that § 666 required the prosecution to prove a quid pro quo; (2) whether § 666 should be construed to proscribe local campaign contributions

accepted by local officials as "agents" who lack any authority over government funds; and (3) whether the Government's rebuttal summation constituted prosecutorial misconduct by unfairly prejudicing Petitioner.   Since, Petitioner neither objected at trial nor challenged the evidentiary rulings regarding Mr. Dwek's testimony on direct appeal, she is procedurally defaulted from raising this claim now unless one of the two exceptions to procedural default apply.

Petitioner puts forward no new evidence of her "actual innocence" such that the Court's failure to consider her claim would result in a miscarriage of justice. See Hodge, 554 F.3d at 378-79.  Rather, Petitioner argues that the second exception to procedural default should apply since a valid cause for the default exists, namely, that "[s]he was not in any position to object until after she discovered that Dwek's testimony had been significantly curbed in her codefendants' cases. She could not have raised this issue at any earlier junction." (Petr. Reply Br., at 2-3).  Further, Petitioner contends that the prejudice resulting from the default is that she "might not have been convicted of two counts of bribery.  Dwek's chronic use of the terms 'bribe' and 'corrupt' obviously were effective for the Government." (Id., at 3).

The Court is not convinced that evidentiary rulings in subsequent trials provide a basis for employing the valid cause exception for the procedural default.  The issues Petitioner raises regarding the admissibility of certain statements by Mr. Dwek are standard issues presumed to be known to practicing attorneys for whom objections regarding admissibility pursuant to Fed. R. Evid. 701 are routine.  Further, the Court's decisions on evidentiary rulings in the Suarez and Elwell trials cannot be deemed notice for the existence of the Federal Rules of Evidence and of Appellate Procedure in standard criminal trial and appellate practice.  Otherwise, any attorney who fails to object to the admissibility of evidence under the Federal Rules of Evidence at a criminal trial could ignore his client's interests both at trial and on appeal on the basis that the

16

presiding judge's admission of testimonial evidence in another case could allow the admissibility to be relitigated. The Court cannot support an end run around the purposes of the procedural default by allowing an attorney to argue that notice of the validity of the Federal Rules of Evidence was given on the basis of a judge's ruling in another matter and in an altogether different context declining to admit testimony of the same or similar witness. Therefore, the Court finds no external, objective impediment preventing counsel from constructing or raising a Sixth Amendment claim through objection at trial or on Petitioner's appeal to the Third Circuit. In the absence of cause, the Court need not address the issue of prejudice, but the Court notes the Third Circuit's own reference to the "considerable amount of evidence showing that Beldini violated § 666, including video and audio recordings," independent of Mr. Dwek's testimony, such that she has not met her burden of showing a reasonable probability that the trial's result would have been different had Mr. Dwek's testimony been curtailed.

### 2.  Sixth Amendment Right to a Fair Trial

Even if the Court were to grant an exception to Petitioner's procedurally defaulted claims, it would still find that she has failed to establish a constitutional violation on the merits. The Petition locates the constitutional violation in this Court's trial error in failing to suppress certain of Mr. Dwek's statements during direct and cross-examination as improper evidence.  In considering whether a conviction should be reversed based on a witness's testimony, a court examines whether the remarks, "taken in the context of the trial as a whole, were sufficiently prejudicial to have deprived [the defendant] of [her] right to a fair trial." United States v. Di Pasquale, 740 F.2d 1282, 1297 (3d Cir. 1984).  Three factors are analyzed in determining whether the defendant was prejudiced: "(1) whether [the witness's] remarks were pronounced and persistent; (2) the strength of the other evidence; and (3) curative action taken by the district

court." United States v. Riely, 621 F.3d 312, 335-36 (3d Cir. 2010)(citations and quotations omitted).

The Court does not find that the statements by Mr. Dwek, taken in the context of the trial as a whole, sufficiently prejudiced Petitioner so as to constitute a Sixth Amendment fair trial violation. Despite Petitioner's citations to statements made by Mr. Dwek during direct and cross-examination, a closer review of the record reveals that Petitioner's characterization of said statements is unmerited. First, with respect to Mr. Dwek's use of the word "bribe" and "corrupt," or their variants:

- Mr. Dwek used the word "bribe" or some variant of it approximately 13 times during his direct examination: four iterations were descriptions of Mr. Dwek's own prior acts; three instances were its utilization in reference to Cheatam or Shaw, and not to Petitioner Beldini; and the remaining six uses were in response to questions asking Mr. Dwek to interpret code words employed on the recordings, such as "contributions," and "the way [Dwek] likes to operate."

- Mr. Dwek used the word "bribe" or some variant of it approximately 20 times during cross-examination: 19 instances were in response to questions regarding Mr. Dwek's own impeachment materials, code words employed in the investigation, and the FBI reports detailing money provided to Mr. Dwek as a cooperating witness for the purpose of "bribe payments," as written in such reports. One instance was in response to a question involving Petitioner, and involved Mr. Dwek's inclusion of an answer that Beldini accepted money when asked whether Beldini was courteous to simply talk to him.

- Mr. Dwek used the word "corrupt" or some variant of it approximately 46 times, the majority of where were in reference to Mr. Shaw and Mr. Cheatam, and the arrangement that they had established amongst themselves. Other references were provided as answers to questions concerning code words, Mr. Dwek's own impeachment materials, and the types of public officials Mr. Dwek was asked to engage and pay by the FBI, namely, "corrupt" ones.

- Defense Counsel utilized the term "corrupt" or some variant of it approximately 38 times, often injecting the term into his exchange with Mr. Dwek. (See, e.g., "The last thing that somebody would want a corrupt—who had a corrupt relationship, would [] want the person with whom you had the corrupt relationship to show up at the event with her, right?" (Trial Tr. of Feb. 2, 2010, p. 7.195, 1:6-9)).

The Court notes further that Mr. Dwek used the term "official action" on two occasions. First, he was asked on direct examination to clarify a statement made during a meeting with Mr.

Shaw and Mr. Cheatam which took place on March 11, 2009, regarding what he meant when he asked them whether Petitioner "operates the way we like to operate," and Mr. Dwek answered in Court that he meant "[t]he way I was operating, and what I was saying then, I wanted to confirm that Leona operated the way I did, and we did with accepting cash corrupt bribe payments for official action to expedite my approvals." (Trial Tr. of Jan. 29, 2010, p. 5.22, l:3-9).  The second was during a cross-examination when asked to interpret code words regarding the sale of tickets in exchange for expediting approvals.  When asked what his statement—"I don't want to, you know, don't want to stuff anything in any more faces"—meant, Mr. Dwek answers, "I meant that I didn't want to stuff the $10,000 in cash that I gave to Jack Shaw and Ed Cheatam in the mayor's face or your client's face for official action." (Trial Tr. of Feb. 3, 2010, p. 8.61, l:3-5).

While there were over 100 total objections by counsel for both Parties during the course of Mr. Dwek's testimony, each of them promptly addressed by this Court, there were no objections lodged by Defense Counsel regarding the use of the terms "bribe," "corrupt," or "official action."  Had Defense Counsel raised any objections, the Court would have then decided whether, in the context of the testimony Mr. Dwek offered and the evidence presented at trial, the testimony would nevertheless be admissible under Federal Rule of Evidence 701, pursuant to which lay witnesses may testify if "not testifying as an expert," and if the testimony "in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

In similar cases involving bribery and the understandings of lay witnesses regarding whether or not it was their impression that they were offered bribes, courts have found that

statements regarding an impression that a "bribe" was offered is a "lay conclusion . . . rationally based on the witness' perception and helpful as a summary of a lengthy, complicated conversation between sophisticated and intelligent persons unlikely to speak bluntly to each other about such matters as bribery." United States v. Eisen, 1991 U.S. Dist. LEXIS 12597, at • 8-9 (E.D.N.Y. Sept. 5, 1991). In Eisen, the court also rejected the argument that a new trial was warranted due to inadmissible opinion testimony since, "[u]nder Rule 701, [the witness's] 'impression' testimony was admissible as rationally based on what he saw and heard and helpful to an understanding of a lengthy, three-person conversation using circumspect language in the absence of a transcript of the conversation from which the jurors could draw their own conclusions." Id., at *11. In United States v. Curescu, a similar challenge was made concerning a statement by a government witness interpreting defendant's wording—"five and five and two"— meant in the context of a recorded conversation that "he wanted to pay [a maximum of] $5000 per illegal dwelling unit as a bribe." 2012 WL 934113, at * 3 (7th Cir. Mar. 21, 2012). In that case, Judge Posner said that the testimony was admissible because the government witness "was testifying not to what [the defendant] actually meant but to what she understood him to mean, which was probative of what he meant but was based entirely on her mental processes rather than his. Such testimony is unexceptionable, . . . even though it implies an opinion about what the speaker was thinking, since such lay opinion testimony is itself, as we said, permissible." Id. (citing United States v. Garcia, 291 F.3d 127, 140-41 (2d Cir. 2001). The Court also noted that "parties to other illegal transactions often avoid incriminating terms, knowing they may be overheard electronically. So if they're involved in bribery, they don't use the words 'bribery,' 'bribe,' or 'bribes,' . . . but instead use words that the other party to the conversation understands to refer to bribes—without that understanding there would be a failure

of communication. . . . Strangers need an interpreter, and a party to the conversation is the

obvious choice to be that interpreter." Id., at * 4.  Likewise, in this case, the instances

documented above in which Mr. Dwek uses the terms "bribe," "corrupt" and "official action"

occur in the context of Mr. Dwek's explanation of his understanding of the statements made by

Mr. Shaw, Mr. Cheatam, and Petitioner, as well as his understanding of the statements made by

FBI agents notifying him of the targets of the Government's investigation into potential unlawful

activity.  Mr. Dwek was the most well-placed individual to provide interpretations as to the

substance of the conversations offered into evidence, and since those interpretations did not cross

the line of asserting Petitioner's guilt or claiming a subjective understanding on the part of

Petitioner, the contested statements fall within the range of admissible statements under Rule

701.  The Court thus does not find such statements were necessarily legally conclusory, or

inadmissible as a matter of law or such that their admission created unfair prejudice to the extent

alleged by the Petitioner.

In addition, the terms "bribe" and "corrupt" have been found by the Third Circuit to be

"routinely reported in the media; they are not terms of art, they are words of common currency

which form part of the vocabulary of almost any American in his teens or older.  Regrettably,

they recur nightly in the television fare of the country."  United States v. Long, 534 F.2d 1097,

1100 (3d Cir. 1976).  On that basis, the Third Circuit reversed a district court's determination

that questions asked by a prosecutor of a grand jury witness utilizing the terms "bribes,"

"kickbacks," and "payoff" were not permissible.  Id.  While the Court has stated and now states

that the use of the term "bribe" can, in certain contexts, be legally conclusory with significant

prejudicial effects, it does not find that the statements cited above as occurring during Mr.

Dwek's direct and cross-examination were so pronounced and persistent as to constitute trial error.

In considering the second and third factors to be assessed in determining whether Petitioner was prejudiced—the strength of the other evidence and the curative action taken by this Court—the Court finds that they weigh in favor of denying Petitioner's request to vacate, set aside or correct her sentence. Significant evidence was adduced at trial beyond the portions of Mr. Dwek's testimony referenced herein. That evidence included: video and audio recordings; testimony and financial records concerning the use of straw donors to break up the $5,000 cash payments into checks for placement in the relevant campaign funds; faxes of copies of deposit slips and related contribution checks from Petitioner breaking down the larger checks given into smaller amounts; the relevant disclosure forms listing the campaign contributions as said smaller amounts; telephone conversations not between parties involved in the bribery scheme in which Mr. Dwek was not present; and a substantial record of FBI recorded conversations about which Mr. Dwek did not comment by using the terms "bribe," "corrupt" or "official action," including conversations between Mr. Dwek and Petitioner in which Petitioner agrees to accept payments from him as the treasurer of Healy for Mayor '09. With respect to curative action to prevent prejudice to the Petitioner, the Court notes that, as stated <u>infra</u>, it expeditiously responded to over 100 objections by the respective Parties' counsel during Mr. Dwek's testimony, and imposed limits and rules regarding evidentiary admissibility as those matters arose; there were no objections made by the Defense during that testimony regarding the use of the terms "bribe," "corrupt" or "official action." For these reasons, the Court concludes that, on the merits of Petitioner's § 2255 Petition, she has failed to establish a constitutional violation of her Sixth Amendment right to a fair trial, and her Petition is accordingly denied.

## IV.  CONCLUSION

For the reasons set forth above, Petitioner's application for Writ of Coram Nobis or, in the alternative, to vacate, set aside or correct her sentence pursuant to 28 U.S.C. § 2255 are both **DENIED**.  Petitioner's request to stay this matter based on Petitioner's medical condition is also **DENIED**.  The Court further finds that no certificate of appealability will issue because Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).  An appropriate Order accompanies this Opinion.

DATED: April 10, 2012

Jose L. Linares
United States District Judge